Helen Davis Chaitman (4266)
Phillips Nizer LLP
666 Fifth Avenue
New York, NY 10103-0084
(212) 841-1320
hchaitman@phillipsnizer.com
*Attorneys for Plaintiffs*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------x
:
In re: : SIPA LIQUIDATION
:
BERNARD L. MADOFF INVESTMENT : No. 08-01789 (BRL)
SECURITIES LLC, :
:
Debtor. :
----------------------------------------------------------: Adv. Pro. No. _____ (BRL)
:
DIANE and ROGER PESKIN, and :
MAUREEN EBEL, :
:
Plaintiffs, :
vs. :
:
IRVING H. PICARD, as Trustee for the :
Liquidation of Bernard L. Madoff Investment :
Securities LLC :
:
Defendant. :
-----------------------------------------------------------x

## COMPLAINT

Diane and Roger Peskin and Maureen Ebel, by their attorneys, Phillips Nizer

LLP, for their complaint against Irving H. Picard, Trustee, allege as follows:

## NATURE OF THE ACTION

1.      This is an action for a declaratory judgment and for damages arising from

the deliberate and bad faith failure of Irving H. Picard, as Trustee selected by the

Securities Investor Protection Corporation ("SIPC") in the proceeding instituted on

December 15, 2008 for the liquidation of Bernard L. Madoff Investment Securities LLC ("Madoff") under the Securities Investor Protection Act, 15 U.S.C. § 78aaa, *et seq.* ("SIPA").

2.      Plaintiffs were defrauded by Madoff, prepetition, out of their life savings. Now, they are being victimized postpetition by Picard who is improperly acting to protect the brokerage industry represented by SIPC at plaintiffs' expense.

3.      Picard, as a Trustee, has a fiduciary duty to plaintiffs. *See In re Adler, Coleman Clearing Corp.*, 1998 Bankr. LEXIS 1076 (B. S.D.N.Y. Aug. 25, 1998) ("The parties agree that a SIPA trustee owes a fiduciary duty to the customers and creditors of a liquidating broker dealer akin to the fiduciary duty a bankruptcy trustee owes a debtor's estate and creditors").  In breach of his fiduciary duty, Picard has refused to pay plaintiffs the $500,000 in SIPC insurance to which they are entitled under the express provisions of SIPA.  Picard has insisted that he is entitled to withhold from plaintiffs sums they withdrew from their Madoff accounts within the 90 days preceding the institution of this case, pursuant to 11 U.S.C. § 547.

4.      However, the funds that Picard is refusing to pay plaintiffs will not go into the general estate of customer property for distribution to all customers on a *pro rata* basis, as contemplated by 11 U.S.C. § 547.  Rather, the money will simply reduce SIPC's obligations to these parties.  Thus, Picard seeks to withhold alleged preferential payments from plaintiffs so as to benefit SEC-regulated broker-dealers, who are financially obligated to fund SIPC's insurance costs.

5.      Picard's conduct is inconsistent with SIPA and is a breach of his fiduciary duties to the plaintiffs.  SIPA was enacted to protect investors and to maintain confidence

in the securities markets.  *See, e.g.,* H.R. Rep. No. 91-1613, at 3-4 (1970)("[SIPA] will reinforce the confidence that investors have in the U.S. securities markets.")

6.      When SIPA was amended in 1978, the goal was to fix "[o]ne of the greatest shortcomings of the procedure under the 1970 Act, to be remedied by [the 1978 amendments], *[i.e.]*, . . . **the failure to meet legitimate customer expectations of receiving what was in their account at the time of their broker's insolvency**."  D 922 Cong. Rec. H. 36326 (daily ed. Nov. 1, 1977)(statement of Rep. Robert C. Eckhardt)(emphasis added).

7.      Based upon the plain language and intent of SIPA, plaintiffs are absolutely entitled, as a matter of law, to withdraw funds from their accounts.  Precisely because SIPA requires that the legitimate expectations of customers be met by SIPC, Picard is not entitled to recover alleged preferential payments from plaintiffs, who had an absolute right to withdraw those funds whenever they needed them.  Thus, Picard cannot establish the elements of a preference under the Bankruptcy Code.

8.      Finally, plaintiffs are entitled to a claim in this case for their "net equity" as defined under SIPA.

9.      In derogation of his obligations to carry out the provisions of SIPA, Picard has invented his own definition of "net equity."  In furtherance of his goal to protect the brokerage industry from further assessments by SIPC at the investors' expense, Picard has insisted on recognizing investors' claims only for the amount of their net investment, disregarding all appreciation in their accounts.  By this *legerdemain,* Picard intends to avoid paying SIPC insurance to the thousands of elderly Madoff investors who have depended upon their Madoff investments for their daily living expenses.

10. Stephen Harbeck, the President of SIPC, justifies this conduct by claiming that:

> Using the final statements created by Mr. Madoff as the sole criteria for what a claimant is owed perpetuates the Ponzi Scheme. It allows the thief . . . Mr. Madoff . . . to determine who receives a larger proportion of the assets collected by the Trustee.

11. Harbeck's statement is a specious, bad faith rationalization of SIPC's goal, which is to save money for the brokerage community at the expense of innocent investors who relied upon the SEC's competence and integrity in investigating Madoff seven times over an 11-year period.

12. After six months of his tenure, Picard has identified only a handful of Madoff investors who might not have had a "legitimate expectation" that the trade confirmations and account statements they received were accurate. For example, Picard has sued two Madoff customers, Stanley Chais and Jeffrey Picower, who, Picard has alleged, took out of Madoff $6 billion more than they invested. Picard has further alleged that these two investors received returns in their accounts of 100 – 400% and that Madoff back-dated $100 million losses in their accounts. Assuming these allegations are true, Chais and Picower were Madoff's co-conspirators and certainly could not have had a "legitimate expectation" that their accounts were genuine.

13. However, the fact that a few out of more than 8,000 Madoff investors may have been Madoff's co-conspirators does not justify SIPC's cheating the remaining, totally innocent investors of their statutory maximum payment of $500,000 in SIPC insurance.

14. Plaintiffs, like thousands of other investors, received returns on their investment in the range of 9 – 11% per year, subject to short term capital gains tax rates.

4

Plaintiffs had entered into standard brokerage agreements with Madoff, a licensed SEC-regulated broker-dealer, pursuant to which they had specified, numbered accounts for the purchase and sale of securities; they received regular monthly statements and trade confirmations reflecting the purchase and sale of Fortune 100 company stocks and the purchase of US Treasury securities. There is no basis whatsoever to claim that plaintiffs did not have a "legitimate expectation" that the assets reflected on their statements belonged to them.

15. Plaintiffs seek both compensatory damages and a declaratory judgment pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, (i) that Picard is obligated to recognize their claims in the amount of their "net equity" as defined by SIPA; (ii) that SIPC has an obligation to promptly pay investors up to $500,000 in SIPC insurance based upon their November 30, 2008 statements; (iii) that Picard has no right to assert preference claims against plaintiffs or to deduct from their SIPC payments the amounts of any payments received by them within 90 days of the institution of this proceeding; and (iv) that Picard extracted from Maureen Ebel, under duress, an acknowledgment that her claim is limited to the amount of her net investment.

16. Plaintiffs also sue Picard for breach of fiduciary duty, based upon the aforesaid conduct.

## JURISDICTION AND VENUE

17. This action is brought as an adversary proceeding pursuant to Rules 7001(1) and (9) of the Federal Rules of Bankruptcy Procedure.

18. The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1334(b) and 2201.

19.     The Court has personal jurisdiction over the Trustee pursuant to Rule 7004 of the Federal Rules of Bankruptcy Procedure.

20.     This adversary proceeding is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (B) and (O).

21.     Venue is proper in this district pursuant to 28 U.S.C. § 1409.

## PARTIES

22.     Diane and Roger Peskin are Madoff investors who reside at 51 East Wall Street, Bethlehem, Pennsylvania 18018.

23.     Maureen Ebel is a Madoff investor who resides at 506 Hansen Drive, West Chester, Pennsylvania 19380.

24.     Defendant is the Trustee appointed at the recommendation of SIPC to administer the liquidation of Madoff under SIPA pursuant to an order entered on December 15, 2008 by the United States District Court for the Southern District of New York.

## ALLEGATIONS COMMON TO ALL CLAIMS

### The Peskins' investment in Madoff

25.     Roger Peskin began publishing the Art Now Gallery Guide (the "Guide") in 1970, working out of his Volkswagen bus.  He began with one editorial assistant and he personally delivered to his customers a one-page listing of gallery and museum exhibitions on Madison Avenue and on 57th Street.

26.     Mr. Peskin built up the Guide to become the most comprehensive source of information on gallery and museum exhibitions in major cities across the United States and, at times, it was published in Europe, South America and Japan.

27.     By 2004, Mr. Peskin employed approximately 20 people and published a 300+ page magazine which included art reproductions, gallery, museum and art fair information, and area maps of all the major cities in the world.

28.     The Guide was sold in August 2004 and Mr. and Mrs. Peskin invested the after-tax proceeds of the sale, along with the proceeds of two properties they sold, into Madoff.

29.     At the time of the Peskins' investment in Madoff, (a) Madoff had been in business for over 40 years; (b) Madoff's trading strategy was known to be diversified and conservative; and (c) the SEC had investigated Madoff seven times over an 11-year period and had publicly vouched for his honesty.

30.     On or about October 18, 2005, the Peskins invested $2,586,412.99 into Madoff.

31.     In early May 2008, the Peskins invested $181,000 into Madoff.

32.     On or about November 12, 2008, the Peskins invested $470,265.98 into Madoff.

33.     After the Peskins established their Madoff account, Mr. Peskin retired and looked forward to living off the income from his Madoff investment.

34.     Every month the Peskins received from Madoff trade confirmations indicating the purchase and sale of Fortune 100 company stocks; the purchase and sale of Treasury securities; and the purchase and sale of options to hedge the securities positions. In addition, the Peskins received monthly account statements showing their securities positions.

1082709.1

35.     In each instance, the trade confirmations and account statements reflected the purchase and sale of securities of Fortune 100 companies at prices consistent with those reported in the media.

36.     During the years of their investment in Madoff, the Peskins earned 9 – 11% each year, in short term capital gains, subject to the highest tax rate.

37.     In the ordinary course, the Peskins regularly withdrew funds from the Madoff account to fund family living expenses, to pay taxes on their Madoff income, and for special expenditures.

38.     On September 15, 2008, the Peskins received a check from Madoff for $50,000 which cleared their account on September 17, 2008.

39.     On October 1, 2008, the Peskins received a check from Madoff for $33,000.

40.     On November 6, 2008, the Peskins received a check from Madoff for $30,000.

41.     At no time did the Peskins have any reason to believe that Madoff was dishonest.

42.     As of November 30 2008, the last month for which the Peskins received a Madoff account statement, the value of their account was $3,247,367.40.

43.     The Peskins filed a SIPC claim on February 19, 2009.

44.     They received no response to their claim until June 3, 2009 when they were contacted by one of Picard's attorneys who informed them that they were entitled to receive $387,000 as their full SIPC payment because Picard was entitled to deduct from

their SIPC payment the $113,000 that they withdrew from their Madoff account in the three months preceding December 15, 2008.

45.     The Peskins pointed out to Picard's attorney that, although they had withdrawn $113,000 from Madoff within the 90 days before December 15, 2008, they had also invested $470,265.98 with Madoff on November 12, 2008.  Thus, their net position in the last 90 days before the SIPA liquidation was positive $357,265.98.  They asked Picard's attorney if they weren't entitled to the full $500,000 in SIPC insurance since they had invested more than they withdrew in the last 90 days.  They were told that the law was absolutely clear that they were not entitled to a credit for the money they deposited.

46.     This statement by Picard's attorney was false because, under 11 U.S.C. § 547(C)(4), a creditor sued for a preference is entitled to offset any "new value" the creditor gave the debtor within 90 days of the filing.  This section provides:

> The trustee may not avoid under this section a transfer
>
> (4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor –
>
> (A)  not secured by an otherwise unavoidable security interest; and
>
> (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor.

**Maureen Ebel's investment in Madoff**

47.     Maureen Ebel is a widow whose husband, Dr. Marc Ebel, died as a result of medical malpractice in 2000 at the age of 53.  The Ebels had been married 27 years.

48.     Mrs. Ebel was a nurse but she stopped working in 1989.

49.     In 2003, a relative recommended that Mrs. Ebel invest all of her funds with Madoff.  The relative told her that Madoff had been in existence for more than 25 years; that he had been approved by the SEC; and that he had a very conservative investment strategy.

50.     Mrs. Ebel opened two accounts with Madoff.  The first account she opened was a direct IRA account in which she invested $1,348,877.12 on February 24, 2003.  Mrs. Ebel never withdrew any funds from this account and it had a balance on November 30, 2008 of $2,532,140.66.

51.     Mrs. Ebel also opened a direct investment account with Madoff in which she invested a total of $3,831,387.49 beginning on March 17, 2003 and ending on July 23, 2004.  The balance in this account as of November 30, 2008 was $4,729,125.04.

52.     With respect to each account, every month Mrs. Ebel received from Madoff trade confirmations indicating the purchase and sale of Fortune 100 company stocks; the purchase and sale of Treasury securities; and the purchase and sale of options to hedge the securities positions.  In addition, she received monthly account statements showing the securities positions.

53.     In each instance, the trade confirmations and account statements reflected the purchase and sale of securities of Fortune 100 companies at prices consistent with those reported in the media.

54.     Mrs. Ebel withdrew funds from her direct investment account on a regular basis and utilized the funds to provide support for herself and her family, to pay for the educational expenses of family members, and to fund charitable donations.  This was her sole source of income.

55.     As part of her normal withdrawal of funds from her account, on September 15, 2008 Mrs. Ebel received a $102,000 check from Madoff dated September 11, 2008.  She deposited the check in her account on September 15, 2008.

56.     After December 11, 2008, Mrs. Ebel was forced to go to work in order to support herself.  She worked as a house maid; she worked as a caretaker for an elderly patient; she worked as a driver; she worked at a cash register; she worked in a ladies' clothing store.  In short, she did anything she could to earn money to pay her living expenses.  She has also been forced to sell a car, jewelry, household items, and a condominium she had in Florida since 1984, at greatly depressed prices because she needed money to live on and had not promptly received her SIPC insurance.

57.     Mrs. Ebel filed her SIPC claim for both accounts on February 14, 2008.

58.     She heard nothing from Picard until May 20, 2009 when she received a determination letter requiring that she acknowledge that her claim with respect to the IRA account was for only $1,348,877.12, the amount of her original investment.  She was informed that it was a pre-condition to her receiving SIPC insurance on this account for her to acknowledge that she was not entitled to a claim for any appreciation in that account.  Because Mrs. Ebel was financially desperate and she had no alternative but to accede to Picard's demand, she signed the required acknowledgments and, on June 6, 2009, she received a check from SIPC for $500,000 with respect to this account.

59.     With respect to the direct investment account, the determination letter indicated that she was only entitled to $398,000 in SIPC insurance because Picard was entitled to deduct the $102,000 payment she received in September 2008.

60.     Thereafter, she had several communications with one of Picard's attorneys.  She was told that Picard was obligated under the law to withhold $102,000 from her SIPC payment.  She was also told that this money would simply reduce SIPC's obligations.  The money would not be used to pay other investors.

61.     Mrs. Ebel asked if she could accept the $398,000 check and yet reserve her right to claim the $102,000 that Picard was going to withhold.  She was told that she would not be able to do that and, if she wanted the check for $398,000, she would have to relinquish her claim to the $102,000.  She explained that she was uncertain whether she should waive her claim to the $102,000.

62.     On May 29, 2009, Mrs. Ebel received another phone call from the attorney for Mr. Picard with whom she had been speaking.  He told her that there had been a change in strategy by Mr. Picard and that she would not have to relinquish her claim to the $102,000 if she accepted the $398,000.  She was told that she would be sent a revised determination letter and accompanying documents.  To date, however, she has not received the revised documents or the check for $398,000.

**SIPC's insurance obligations are funded entirely through the brokerage industry**

63.     Under SIPA, a SIPC trustee is required to "satisfy net equity claims of customers" of a failed member institution.  15 U.S.C. § 78fff(a)(1)(A)-(B).  This Court's Bar Date Order provides that a claim in the Madoff liquidation will be satisfied on the basis of the claimant's "'net equity' . . . as defined in 15 U.S.C. § 78*lll*(11)."  Bar Date Order at 5.

64.     Each Madoff customer is entitled to have his/her claim satisfied by up to $500,000 in SIPC insurance based upon the customer's "net equity."

65.     Pursuant to SIPA, every SEC-regulated broker-dealer prints on its trade confirmations that the customer's account is insured by $500,000 in SIPC insurance.   As intended by Congress, this representation has been a substantial inducement for investors to invest in the American securities markets.

66.     As set forth hereafter, Picard has demonstrated that the representations of SIPC insurance on every trade confirmation of an SEC-regulated broker-dealer are now untrue because, with the apparent blessing of the SEC, SIPC will no longer honor its obligation to provide $500,000 in SIPC insurance for each customer.

67.     SIPA provides that SIPC is charged with the responsibility of assessing the broker-dealers appropriately to ensure SIPC insurance, as provided in the statute.  In the event that SIPC is under-funded, SIPC has access to a $1 billion line of credit from the SEC and a $1 billion line of credit from the U.S. Treasury.  These lines of credit, if utilized, must be repaid by the brokerage industry pursuant to additional assessments on broker-dealer members of SIPC.  *See* 15 U.S.C. § 78ddd(a)(c), (d), (e), (f), (g), and (h).

68.     In the past, SIPC has essentially provided free insurance to broker-dealers. For example, SIPC charged Goldman Sachs (and every other broker-dealer) a mere $150.00 per year for the privilege of Goldman Sachs representing to all of its customers on billions of dollars of trade confirmations that their accounts were insured for up to $500,000 in SIPC insurance.  Now, according to SIPC those representations were untrue.

**Picard has ignored the SIPA definition of "net equity"**

69.     SIPA defines "net equity" as the value of the securities positions in the customer's account as of the SIPA filing date, less any amount the customer owes the debtor.

The term 'net equity' means the dollar amount of the account or accounts of a customer, to be determined by –

(A) calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer . . .; minus

(B) any indebtedness of such customer to the debtor on the filing date . . .

15 U.S.C. § 78*lll*(11)

70.     SIPA specifically prohibits SIPC from changing the definition of "net equity."  15 U.S.C. § 78ccc(b)(4)(A).

71.     The Second Circuit has specifically recognized that:

Each customer's "net equity" is "the dollar amount of the account or accounts of a customer, to be determined by calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer" [corrected for] any indebtedness of such customer to the debtor on the filing date.

*In re New Times Securities Services, Inc.,* 371 F. 3d 68, 72 (2d Cir. 2004); *See also,In re Adler Coleman Clearing Corp.,* 247 B.R. 51, 62 N. 2 (B.S.D.N.Y. 1999)("'Net equity' is calculated as the difference between what the debtor owes the customer and what the customer owes the debtor on the date the SIPA proceeding is filed.").

72.     In the *New Times* case, SIPC voluntarily recognized its obligation under SIPA to pay customers up to $500,000 based on their final brokerage statement, inclusive of appreciation in their accounts, despite the fact that the broker had operated a Ponzi scheme for a period of approximately 17 years and had never purchased the securities reflected on the customers' monthly statements.  In fact, SIPC's president, Stephen

Harbeck, assured the *New Times* bankruptcy court that customers would receive securities up to $500,000 including the appreciation in their accounts.

73.     In a brief SIPC submitted to the Second Circuit in 2006, SIPC assured the appeals court that its policy was to honor the legitimate expectations of investors, even where the broker never purchased the securities.  SIPC wrote:

> Reasonable and legitimate claimant expectations on the filing date are controlling even where inconsistent with transaction reality.  Thus, for example, **where a claimant orders a securities purchase and receives a written confirmation statement reflecting that purchase, the claimant generally has a reasonable expectation that he or she holds the securities identified in the confirmation and therefore generally is entitled to recover those securities (within the limits imposed by SIPA), even where the purchase never actually occurred and the debtor instead converted the cash deposited by the claimant to fund that purchase** . . . [T]his emphasis on reasonable and legitimate claimant expectations frequently yields much greater 'customer' protection than would be the case if transaction reality, not claimant expectations, were controlling, as this Court's earlier opinion in this liquidation well illustrates.

Br. of Appellant SIPC at 23-24 (citing *New Times*)(emphasis added).

74.     Picard's position in the Madoff case is directly contradicted, not only by SIPC's prior treatment of customers in the *New Times* case, but also by a statement that SIPC's general counsel, Josephine Wang, gave to the press on  December 16, 2008 wherein Ms. Wang acknowledged that a Madoff customer is entitled to the securities in his account:

> Based on a conversation with the SIPC general counsel, Josephine Wang, if clients were presented statements and had reason to believe that the securities were in fact owned, the SIPC will be required to buy these securities in the open market to make the customer whole up to $500K each.  So if Madoff client number 1234 was given a statement showing they owned 1000 GOOG shares, even if a transaction never took place, the SIPC has to buy and replace the 1000 GOOG shares.

December 16, 2008 Insiders' Blog, www.occ.treas.gov/ftp/alert/2008-37.html

75.     Picard's position is also inconsistent with the Internal Revenue Code and with Rev. Proc. 2009-20, issued by Commissioner Shulman on March 17, 2009, which expressly recognizes the income earned by Madoff investors, on which they paid taxes annually.

76.     In accordance with the statutory definition of "net equity," the Peskins' claim should be fixed at $3,247,367.40.  Mrs. Ebel's IRA claim should be fixed at $$2,532,140.66 and her direct investment account claim should be fixed at $3,831,387.49.  While these amounts are not as of the filing date, December 15, 2008, they are based on the November 30, 2008 statements received by plaintiffs which is the closest date on which account statements were produced by Madoff.

77.     Despite the unambiguous language of SIPA, and its prohibition against SIPC changing the definition of "net equity," Picard has consistently taken the position in this case that a customer's "net equity" is the net amount invested, thereby excluding what may have been 40 years of appreciation.

**Picard's invented definition of "net equity" is intended to save SIPC $billions.**

78.     Picard's definition of "net equity" serves two important purposes for SIPC.  Although it violates the requirement that SIPC "promptly satisfy all obligations of the member to each of its customers" (15 U.S.C. § 78fff-4(c)), it allows Picard to use the excuse that he can't pay any claims until he has his team of forensic accountants review all of the records of Madoff relating to each account.  At the rate Picard is paying claims, customer claims might not be fully paid by SIPC for eight years.

79.     If Picard had complied with his statutory obligations and "promptly" paid all customer claims based upon their November 30, 2008 statements, all the Madoff

16

investors' SIPC claims could have been paid in full within three months. Instead, plaintiffs have suffered substantial damages as a result of their inability to recover their SIPC insurance payment in a timely manner.

80.     The second advantage to SIPC of Picard's invented definition of "net equity" is that, by reducing the customer's claim to his/her net investment, Picard is able to reduce SIPC's obligations by billions of dollars. For example, a customer whose account was started in 1960 with $50,000, whose "net equity" according to SIPA is $1,600,000, would be entitled to a mere $50,000 payment from SIPC. If that customer had withdrawn $50,000 or more from his account since 1960, SIPC would be relieved of any obligation to pay SIPC insurance to that customer.

81.     The practical effect of Picard's definition of "net equity" is that SIPC will not pay any money to thousands of people who invested with Madoff in the 1960's, '70's, '80's, and 90's, whose accounts appreciated substantially and who, after retirement, drew out funds annually to pay taxes on their "phantom" income, to support themselves, and to satisfy the mandatory withdrawal obligations of their IRA accounts.

82.     The legislative history of SIPA makes clear that Congress' intent was to protect a customer's "legitimate expectations." For example, Congressman Robert Eckhardt commented when SIPA was amended in 1978:

> One of the greatest shortcomings of the procedure under the 1970 Act, to be remedied by [the 1978 amendments] is the failure to meet legitimate customer expectations of receiving what was in their account at the time of their broker's insolvency.
>
> *       *       *
>
> A customer generally expects to receive what he believes is in his account at the time the stockbroker ceases business. But because securities may have been lost, improperly hypothecated, misappropriated, never

17

purchased, or even stolen, this is not always possible. Accordingly, [when this is not possible, customers] will receive cash based on the market value as of the filing date.

H.R. Rep. 95-746 at 21.

83.     SIPC's Series 500 Rules, 17 C.F.R. 300.500, enacted pursuant to SIPA, provide for the classification of claims in accordance with the "legitimate expectations" of a customer based upon the written transaction confirmations sent by the broker-dealer to the customer.

84.     Plaintiffs had a legitimate expectation that the money in their Madoff account, and the appreciation in their Madoff account on which they paid taxes every year, belonged to them. Thus, Picard is obligated by both the express language of SIPA and by its legislative intent, to honor plaintiffs' claims in the amount shown on their November 30, 2008 statements.

**Picard has no right to enrich the brokerage industry at plaintiffs' expense**

85.     Picard has indicated to plaintiffs, through his counsel, that, even though they have at least $500,000 in "net equity" according to his definition, he is not going to pay them $500,000 in SIPC insurance because he claims he is required by law to deduct the withdrawals they made within 90 days of December 15, 2008.

86.     This is a misrepresentation of the law.

87.     The legislative history of the preference provision of the Bankruptcy Code, 11 U.S.C. § 547, makes clear that the purpose of the provision was to assure an equal distribution of the debtor's assets among all creditors. Congress recognized that, in the 90 days before a debtor files in chapter 11, some creditors may be able to exert more pressure on the debtor to pay them than other creditors and, hence, Congress felt it was

equitable to reverse all payments out of the ordinary course of business, to require

creditors who received preferential transfers to return them to the estate for the benefit of

all creditors.

88.     Thus, 11 U.S.C. § 547(b) provides:

b) Except as provided in subsection (c) of this section, the trustee may avoid
any transfer of an interest of the debtor in property -

   (1) to or for the benefit of a creditor;

   (2) for or on account of an antecedent debt owed by the debtor before
such transfer was made;

   (3) made while the debtor was insolvent;

   (4) made -

   (A) on or within 90 days before the date of the filing of the petition; or

   (B) between ninety days and one year before the date of the filing of
the petition, if such creditor at the time of such transfer was an insider; and

   (5) that enables such creditor to receive more than such creditor would
receive if -

   (A) the case were a case under chapter 7 of this title;

   (B) the transfer had not been made; and

   (C) such creditor received payment of such debt to the extent provided
by the provisions of this title.

89.     The preference provision is inapplicable to customers in a SIPA

liquidation for several reasons.  First, any withdrawal by a customer from his/her account

constitutes a withdrawal of the customer's money; it does not constitute "property of the

debtor."   Thus, 11 U.S.C. § 547(b) is inapplicable.

90.     Second, the purpose of Section 547 is to bring back assets of the debtor for

equal distribution to all creditors.  Here, however, Picard seeks to appropriate the money

plaintiffs received within 90 days of December 15, 2008, not for the benefit of all investors but rather simply for the benefit of SIPC and the broker-dealers that SIPC represents.

91.     Congress did not enact SIPA to enrich Wall Street.  On the contrary, Congress enacted SIPA to protect investors in SEC-regulated broker-dealers against the dishonesty of any such broker-dealers.  The central purpose of the statute is to honor the legitimate expectations of customers.  Clearly, it is inconsistent with SIPA for Picard to reduce the SIPC insurance payable to each customer so as to save SIPC money.

**Picard cannot recover from plaintiffs under 11 U.S.C. § 547**

92.     Even if a SIPC trustee is empowered to utilize the avoidance provisions of the Bankruptcy Code against a customer, Picard cannot recover from plaintiffs under 11 U.S.C. § 547 because the withdrawals they received within 90 days of December 15, 2008 constituted their own property and were transferred to them in the ordinary course of business of the plaintiffs and of Madoff on ordinary business terms.   Thus, they were not transfers on account of antecedent debt.

93.     In addition, 11 U.S.C. § 547(c) provides an affirmative defense to a preference claim.  It provides that:

The trustee may not avoid under this section a transfer –

(1) to the extent that such transfer was -

(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange;

(2) to the extent that such transfer was -

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms.

94.     Plaintiffs can establish that they meet the criteria of this affirmative defense:  the withdrawals from their accounts within 90 days of December 15, 2008 were intended by Madoff and by the plaintiffs to be a contemporaneous exchange for new value given to Madoff; were substantially contemporaneous; and were made in the ordinary course of business of the plaintiffs and of Madoff.

95.     Finally, even if Section 547 were applicable to customers in a SIPA proceeding, plaintiffs are entitled to credit for new value they transferred to Madoff within 90 days of December 15, 2008.  Giving the Peskins credit for the $470,265.98 they invested on November 8, 2008, there could be no preference recovery against them.

### FIRST CLAIM FOR A DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. § 2201

96.     Plaintiffs repeat the allegations heretofore stated.

97.     Plaintiffs are entitled to a judgment pursuant to 28 U.S.C. § 2201 declaring  that Picard is bound by SIPA to fix a customer's claim at the balance shown on the customer's November 30, 2008 statement, absent evidence that the customer was in complicity with Madoff's fraud.  Thus, the Peskins are entitled to a claim for $3,247,367.40 and Mrs. Ebel is entitled to a claim for her IRA account in the amount of $2,532,140.66 and to a claim for her direct investment account of $3,831,387.49.

98.     Mrs. Ebel is entitled to an order voiding the partial assignment and release that Picard required her to execute with respect to her IRA account as a condition of her

receiving her $500,000 in SIPC insurance because he exercised unfair and undue pressure on her, at a time when she was in a financially desperate situation, in order to obtain her consent to a claim in the amount of her original investment.

99. Plaintiffs are entitled to judgment pursuant to 28 U.S.C. § 2201 declaring that Picard has no authority to withhold from plaintiffs $500,000 in SIPC insurance simply because they received withdrawals from their accounts within the 90 days prior to the filing because:

a. Plaintiffs had a "legitimate expectation" that the withdrawals constituted their money and it is inconsistent with the provisions of SIPA and its legislative intent to avoid transfers of funds to innocent investors.

b. It is inconsistent with SIPA and its legislative intent for the avoidance powers of the Bankruptcy Code to be utilized to enrich SIPC and its members at the expense of investors.

c. Plaintiffs received the withdrawals within 90 days of December 15, 2008 in the ordinary course of their business and Madoff's business and according to ordinary business terms. Thus, Picard cannot establish the elements of a preference under 11 U.S.C. § 547.

## SECOND CLAIM FOR COMPENSATORY DAMAGES

100. Plaintiffs repeat the allegations heretofore stated.

101. Picard willfully failed to comply with his statutory obligation to "promptly" pay plaintiffs' claims.

102. Picard had a fiduciary duty to plaintiffs.

103. He knowingly, intentionally and/or negligently breached such fiduciary duty by failing to promptly pay plaintiffs' claims and by deliberately inventing a new definition of "net equity" which SIPA expressly prohibited him from doing.

104. Picard further knowingly, intentionally and/or negligently breached such fiduciary duty to Mrs. Ebel by forcing her to sign anpartial assignment and release with respect to her IRA account as a condition of her receiving her $500,000 in SIPC insurance, by exerting unfair and undue pressure on her, at a time when she was in a financially desperate situation, in order to obtain her consent to reduce the amount of her claim to the amount of her original investment.

105. Plaintiffs have suffered substantial damages by virtue of Picard's breach of his statutory obligations and fiduciary duties. They have been forced, *inter alia,* to sell assets at depressed prices because they had no source of funds for their living expenses and they have incurred other damages as well as egregious and unnecessary pain and suffering.

106. Picard's actions were taken in bad faith because the SIPA requirements are clear on their face and Picard flagrantly ignored those requirements in order to enrich the brokerage industry at the expense of Madoff's investors.

WHEREFORE, plaintiffs demand judgment as follows:

1. On the first claim, for a declaratory judgment that:

(i) Picard is obligated to recognize plaintiffs' claims in the amount of their "net equity" as defined by SIPA, *i.e.*, the balance shown on their November 30, 2008 statements;

(ii)     SIPC has an obligation to promptly pay investors up to $500,000 in SIPC insurance based upon their November 30, 2008 statements;

(iii)    Picard has no right to assert preference claims against plaintiffs or to deduct from their SIPC payments the amounts of any payments received by them within 90 days of the institution of this proceeding; and

(iv)    Picard extracted from Maureen Ebel, under duress, an acknowledgment that her claim for her IRA account is limited to the amount of her net investment and that, therefore, Ebel's acknowledgment is void.

2.    On the second claim, for compensatory damages against Picard for the losses suffered by plaintiffs as a result of Picard's failure to "promptly" pay their claims, as required by SIPA.

3.    And for attorneys' fees and costs and such other relief as the Court deems just and proper.


Dated:  New York, New York
            June 10, 2009

Respectfully submitted,

PHILLIPS NIZER LLP


By:  s/s Helen Davis Chaitman


666 Fifth Avenue
New York, NY 10103-0084
(212) 841-1320
hchaitman@phillipsnizer.com
*Attorneys for Plaintiffs*